[No. 25156. *En Banc*. April 3, 1935.]

LUCINDA REED, *Respondent*, v. GEORGE ETSELL *et al.,* *Appellants.*[1]

*Palmer, Askren & Brethorst (H. W. Haugland, of* counsel), for appellants.

*Tucker & Tucker,* for respondent.

BEALS, J.—This is an action brought by plaintiff to recover $2,331.33 from defendants upon an alleged oral

[1]Reported in 43 P. (2d) 15.

promise to pay for personal service and care rendered by her to one Thomas Stine. Defendants denied the promise and set up the statute of frauds as an affirmative defense. From a judgment entered on findings favorable to plaintiff, defendants appeal.

The following facts are either undisputed or are found in the testimony of the respondent: The appellant Rose Etsell is the mother of George Etsell. Stine was a business associate of Rose Etsell's deceased husband, and had been an intimate friend of the Etsell family for thirty-five years. Stine had no relatives. The Etsell family were his closest friends. He and Mrs. Etsell owned a valuable piece of property on First avenue south, in Seattle. Stine, in his early life, was engaged in railroad work. About 1906-1908, he sustained very severe injuries, which prevented him thereafter from following any occupation requiring any considerable physical activity. For many years, he worked as an elevator operator.

Early in the year of 1929, he became wholly incapacitated and went to the home of one Anderson, who cared for him for a short time. Stine, however, became dissatisfied with this arrangement and went to a small house of his own, where he lived alone until August 22, 1929. During this period, his condition became deplorable, owing to his inability to care for and control himself physically.

Respondent maintained a home or sanitarium for the care of invalid and aged people. Some ten days prior to August 22nd, George Etsell and his wife called on respondent to see if they could make arrangements with her to care for Stine. At that time, respondent agreed to take care of Stine for fifty dollars per month. It is not claimed that the Etsells themselves then undertook to pay anything for Stine's care.

Stine was brought to respondent's home on August 22nd. In the meantime, respondent learned from other sources that Stine was in a more helpless condition than he was represented to be by the Etsells. So she raised her price to sixty dollars per month, which amount Stine paid for the first month. Stine, however, objected so vigorously to paying that amount that respondent reduced the charge to fifty-five dollars per month. This amount Stine paid respondent until May or June, 1930, when, on respondent's demand, he paid seventy-five dollars a month until August, 1930. From then until Stine's death, December 8, 1930, respondent demanded and received from Stine one hundred dollars per month for his care.

After his death, respondent submitted a claim for $518 to the attorney in charge of the administration of Stine's estate. This claim was partly on account of damage to furniture, bedding and carpets; the rest was for the balance claimed to be due for care. This amount was computed on the basis of a monthly charge of one hundred dollars from August 22, 1929, to the date of Stine's death. The attorney advised respondent that the court would not allow the claim, so respondent did not press it.

Thereafter, under date of October 20, 1932, respondent mailed a bill for $435 to Mrs. Rose Etsell. With the bill was the following note:

"Mrs. Rose Etsell:

"Enclosed please find bill as you promised on phone after trial & also before his death. Hoping this finds you well leave Anne and I well      Respfuly
                              LUCINDA REED."

This was the first demand for payment respondent ever made on any of the appellants.

Appellants having failed to pay the bill, respondent then brought this action for $2,331.33. There is in-

cluded in this amount some small items for damage to furniture, carpets and bedding. The rest is the balance claimed to be due for care at the rate of two hundred dollars per month for the whole time Stine was at respondent's house.

R. H. Collins, a witness on behalf of appellants, testified that he had been well acquainted with Mr. Stine for several years, and had represented him in connection with the care of some of Mr. Stine's property; and that he had been named as executor of Mr. Stine's will. He further testified that he had visited Mr. Stine at respondent's home, and that, on one occasion, after Mr. Stine had been with respondent a little while, respondent told the witness that she felt she was not receiving sufficient compensation, and that she wanted to raise her charge from fifty-five to seventy-five dollars per month. The matter was discussed with Mr. Stine, who asked the witness to take him back to Kirkland and establish him in the little house which he owned there. Mr. Collins testified that he told respondent that he thought she should have more money, and that possibly the difference might be made up out of the rentals which the witness was collecting from Mr. Stine's property. After Mr. Stine's death, Mr. Collins testified that he, under advice from the attorney for the estate, told respondent that the estate could compensate her for any damage which Mr. Stine had done to her property, but that no extra compensation for his care, board and lodging could be allowed.

Respondent testified that, the second time appellants came to see Stine at her house, which was during the first month he was there, she said she could not keep him for the amount that he was paying her; that, in order to induce her to keep him, George Etsell said:

"Well, we have been everywhere and tried to get him in, and we figured if we told you exactly how he was you would not take him. . . . We have been to the Kenney Home and many places, and we could not get him in unless he signed over all his property. . . . We will pay you well. . . . He won't pay you more, but we will pay you. . . . When everything is over we will settle up with you and we will do well by you, and we will settle when everything is over. . . . You just take care of Mr. Stine, and when we get his money we will pay you well."

Respondent testified that Mrs. Rose Etsell said:

"We will pay you . . . George and I . . . We know he is not paying enough. . . . So, if Mr. Stine does not pay you for his keep we will pay you . . . and we will pay you well."

Appellants denied having made any such statements.

As to her dealings with Mr. Stine, respondent testified that she filled out many of his checks for him to sign, and that she had several talks with him concerning the amount which she should receive from him each month; that, in May or June, 1930, she told him that he must pay seventy-five dollars a month or leave her establishment. In connection with these matters, she testified as follows:

"A. Well he said, he says, 'I won't pay,' he says, 'only this month.' Q. Just this month? A. And then when Etsells came I told them about it; a month before I raised it they knew I was going to raise the price. Q. You told the Etsells you were going to raise the price. A. Yes. In fact, I wanted them to take him. I would have been glad to get rid of him. It was almost unbearable. Q. And this conversation was a month before May or June, 1930. A. Yes. Q. And you said you would have to have seventy-five dollars a month then. A. Yes. Q. So when you came to make out that check that month for Mr. Stine to sign you filled in seventy five dollars a month. A. Yes. Q. Did you tell him he had to pay you that

much? A. Yes. Q. And what did he say? A. He wanted to leave. Q. And then finally he said he would pay it just one month. A. Yes. Q. What about the next month, June or July? A. He paid it. Q. He didn't argue with you? A. Well, he always argued. Even every payday he always argued, and he said 'It surely isn't payday again.' He always argued that question. Always. Q. Did he argue the amount of the check? A. Yes. Q. What did he say about paying seventy-five dollars in June, 1930? A. Well, he paid. Q. He did pay it. A. Yes. Q. Then he paid seventy-five dollars a month for two months. A. Yes. Q. And you told him he had to pay you more money. A. Yes. Q. Tell us about the conversation in August when it was raised to one hundred dollars a month. A. There was no conversation, but I said the job was awful, something awful, and I was in hopes he would go away. Q. What did he say? A. He paid it. But, he grumbled about it. Q. Did he say he wanted to leave you? A. Yes. He was always talking about going back and staying over there for ten dollars a month."

In connection with her conversation with appellants, it will be noted that respondent testified that she told ·appellants that she had demanded more money, and that, a month before she raised her price, they knew that she was going to do so.

The trial court found that statements were made by the parties as testified to by respondent, and that they amounted to a direct and original promise on the part of appellants to pay respondent a reasonable amount for caring for Mr. Stine. Appellants denied making any statements in connection with Mr. Stine's care upon which any contract between them and respondent could be based. They admit, of course, discussing with respondent the matter of the amount which she should receive from Mr. Stine, but denied any promises on their part to the effect that they would compensate her for services rendered him.

It is evident, of course, that Mr. Stine was financially able to pay one hundred dollars a month for room, board and care, and that amount seems to have been the greatest amount demanded by respondent until long after Mr. Stine's death. Respondent admits much discussion and wrangling with Mr. Stine over what she was to receive for caring for him. After his death, she discussed with his executor the matter of further compensation, but, although she was informed that the estate could compensate her for property damaged, she took no steps to present any claim even on that account. Long afterwards, she made demand upon Rose Etsell for $435.

Examination of the record convinces us that the evidence preponderates against the finding of the trial court to the effect that appellants agreed to pay respondent any sum whatever on account of Mr. Stine's care. It is doubtless true that one hundred dollars a month was a reasonable sum to be paid to anyone who would take care of the sick man, but the evidence does not support a finding to the effect that appellants ever agreed to pay respondent that or any other sum.

The view we take of this phase of the case renders it unnecessary to determine whether or not the evidence shows any lawful consideration for the alleged agreement between respondent and appellants; or whether, if such an agreement was made in the form contended for by respondent, the same was within the statute of frauds.

The judgment appealed from is reversed, with instructions to the trial court to dismiss the action.

TOLMAN, STEINERT, GERAGHTY, and BLAKE, JJ., concur.

MITCHELL, J. (dissenting)—I dissent.

This action was brought to recover, among other things, a balance due for the reasonable value of services rendered, according to the direct promise of the defendants to pay, as the court found, less certain amounts the plaintiff had received on the contract price. The finding of the trial court was that the plaintiff was entitled to pay for fifteen months and nine days at one hundred dollars per month, upon which amount she had received $1,105, leaving a balance of $425, in which amount she was given judgment against the defendants.

There was nothing formal about the claim of which she spoke to the attorney for the estate, referred to in the majority opinion. The instrument was not dated, nor signed, nor verified, nor directed to anyone, nor filed, nor was it entitled in the Stine estate; it consists of figures principally, having the appearance of being intended to assist one in refreshing the memory in discussing the matter; and, when the attorney for Mr. Collins, executor, to whom she spoke of the matter, told her the court would not allow her anything, she did not present or file any claim against the estate, even for the furniture, carpets, and bedclothing destroyed by Mr. Stine.

The *trial* referred to in the note accompanying the bill presented by Mrs. Reed to Mrs. Rose Etsell, mentioned in the majority opinion, was an unsuccessful contest of Mr. Stine's will. As to the presentation of the bill to Mrs. Rose Etsell, Mrs. Etsell testified:

"Q. Did she ever present a claim to you for any portion of this bill? A. *Well, she did present that bill after the estate was settled.* Q. How did she do that. A. Well, in writing. Q. In a letter? A. In two bills I believe. One might have been a letter and then the other one a bill. I don't remember that. Q.

And that is this paper marked Defendants' Exhibit 2?
A. Yes, that is a letter, and then here is a bill. Yes.''

This bill was presented about two years after Stine's death. The majority opinion says:

''This was the first demand for payment respondent ever made on any of the appellants.''

This appears to be true; Mrs. Reed respected the terms of her contract with them. The Etsells told her, as set out in the majority opinion:

''When everything is over we will settle up with you and we will do well by you, and we will settle when everything is over. You just take care of Mr. Stine and when we get his money we will pay you well.''

On this same subject, upon testifying that the Etsells agreed to pay her, Mrs. Reed, on cross-examination, said:

''Q. And you never did present a bill during this time that Mr. Stine was living there? A. I was not supposed to.''

The principal controversy is whether the Etsells made a direct, original promise to the respondent to pay for the care of Mr. Stine, or whether their promise was collateral to one by Mr. Stine. There was no evidence that, in making the arrangements, Stine requested or expected the Etsells, or either of them, to act as agents for him. Learning that Mrs. Reed cared for sick persons at her residence, the Etsells called on her, one or more at a time, on two occasions, a week or more *prior* to placing Stine there for the care and attention he later received, to arrange for putting him there as a patient. Mrs. Reed did not know Mr. Stine, nor had she had any communication with him until he actually entered the home.

The Etsells made the arrangement personally, and it is perfectly evident that, in doing so, they purposely

withheld from Mrs. Reed anything like a fair and honest account of the wretched and helpless condition, both mentally and physically, of Mr. Stine. "After she had him a few days," and becoming aware of how she had been imposed upon, she told the Etsells to take him away; that she could not care for him for the amount being paid. That is, she did not tell Mr. Stine that he must leave, nor insist upon his paying more, but she reported the situation to the Etsells, who made the arrangements with her, that they must take him away, that she could not keep him for the amount they agreed upon. The answer of the Etsells was their direct personal contract by which they induced Mrs. Reed to take care of him, saying, as mentioned in the majority opinion, "Well, we have been everywhere and tried to get him in, and *we figured if we told you exactly how he was you would not take him;*" and further, that they said,

"*We will pay you well.* . . . He won't pay you more, *but we will, when everything is over we will settle up with you and we will do well by you;* and we will settle when everything is over, you just take care of Mr. Stine and *when we get his money we will pay you well.*"

She repeated the same statements at another time in answer to a question that the Etsells told her,

"When everything is over we will settle up with you and we will do well by you, and we will settle when everything is over. 'They says we can't do it now.'"

She stayed by her contract with them, and now that at least one of them has come into a large inheritance, about eight thousand dollars, under Stine's will, and the time has come for the respondent to receive the balance due her under the terms of her contract with them, appellants are allowed to escape.

In giving the evidence with respect to the contract,

the majority opinion fails to mention what to me appears to be important testimony. Without doubt, the Etsells were all working together to have their family friend and prospective donor taken care of. Respondent testified that they, George Etsell and his wife, asked her to take care of Mr. Stine; that they were interested in his property; that a part of it had been willed to George Etsell; and that "they told me they would pay me well." That they told her Stine was stingy and would not pay her enough, but that they would pay her well. The same promise was made by Mrs. Rose Etsell, of which respondent testified:

"A. Yes, the first time she was there, she says this, 'Mrs. Reed, we know he is awful hard to take care of,' and she says,—and she says 'We will pay you,' and I said *'Who do you mean by "we"?'* And she said 'George and I.' Q. Will pay? A. Yes. 'George and I'."

Corroborating Mrs. Reed's testimony, a disinterested witness, who was working for Mrs. Reed as a nurse at the time the contract was made, testified as follows:

"Q. Did George Etsell or Rose Etsell or George's wife ever say anything about who was going to pay for the bill? A. Yes, they said they would pay well when it all was settled. Q. Who would pay well? A. Mrs. George Etsell, Mrs. Rosa Etsell, and I heard George and his wife say too they all pay well when they get settled up. Q. When they get settled up? A. Yes."

Her testimony was in no way changed or weakened on cross-examination, and she was the only disinterested witness on either side who testified as to what the contract was.

Such was the contract. Mrs. Reed, now understanding the really deplorable condition of Stine and mak-

ing a contract to take care of him, wanted to know, of course, and therefore asked who was to pay her, and received the promise and answer that constituted the contract, the performance of which is the basis for this action. Further, the testimony, considered altogether, is clear that the Etsells were to have credit for all amounts Stine would pay. Other testimony of a similar kind need not be set out. The essential facts have been given.

The trial court found:

"(3) That during the month of August, 1929, the defendants then being interested in the welfare, custody and control of one Thomas F. Stine, and expecting either individually or collectively to become beneficiary interested under the last will and testament of one Thomas F. Stine, who at that time was an invalid suffering mentally and physically from divers, sundry mental and physical incurable infirmities, orally agreed with the plaintiff that the defendants would place the said Stine at the home of said plaintiff, and that plaintiff would care for the said Stine by nursing, boarding, and rooming the said Stine and looking after his physical wants, and that the said Stine would from his own funds pay a portion of what might be exacted by the plaintiff for the services to be rendered, as aforesaid and that when the services were completed the said defendants would pay to the said plaintiff the reasonable worth and value of the said services, she to give credit on account for such sums as the said Stine himself might pay on account thereof; that pursuant to said agreement the said Stine was brought to the residence of the plaintiff on the 23d day of August, 1929, and placed in the care and keeping of the plaintiff, and remained there with the said plaintiff, receiving care and attention as aforesaid, demanded and exacted until the 2nd day of December, 1930, when the said Stine died."

As is often the case, there was some conflict in the testimony, but, in my opinion, it clearly preponderates

in favor of the finding of the trial court. It is a finding which appears to be most reasonable under the facts and circumstances, and is supported by a clear preponderance of the evidence. Such is my view of the testimony, considered as an original proposition, and certainly I am wholly unable to detect in the case anything of a substantial sort to turn aside the faith in, and credit to be given to, the findings of the trial judge, who saw and heard the witnesses, according to the necessary and almost universal rule of practice in this state. The holding and conclusion should be that the contract between Mrs. Reed and the Etsells was direct and primary, for which reasons it does not fall under the ban of Rem. Rev. Stat., § 5825 [P. C. § 7745], which provides, among other things, that "every special promise to answer for the debt, default or misdoings of another person" is void if not in writing or some memorandum signed by the party to be charged therewith.

In my opinion, the judgment entered in the case by the trial court should be affirmed.

MILLARD, C. J., HOLCOMB, and MAIN, JJ., concur with MITCHELL, J.